THE STATE v. ROBERT THOMAS, Appellant,—300 S. W. 823.

Division Two, December 12, 1927.

*William C. Reynolds, S. A. Handy* and *Ray W. Cummins* for appellant.

*North T. Gentry,* Attorney-General, and *David P. Janes,* Assistant Attorney-General, for respondent.

HIGBEE, C.—The defendant was charged by information filed in the Circuit Court of Clay County, with having, on April 23, 1926, stolen certain domestic fowls, the personal property of Irene C. Groves, to-wit, seventeen grown chickens, in the night time, from the messuage of said Irene C. Groves. The information was filed on May 30, 1926, and was based on Section 3314, Revised Statutes 1919. The venue was changed to Carroll County, where the cause was tried to a jury on April 15, 1927, resulting in a verdict finding the defendant guilty and assessing his punishment at four years' imprisonment in the penitentiary. Defendant appealed.

Mrs. Groves owned and lived on a farm in Clay County, Missouri. She spent the night of April 22, 1926, with a neighbor, returning to her home about daylight on April 23. John Sevage lived across the road a little north of Mrs. Groves and about 250 yards distant from her house. It had been raining and there was a bad mudhole in the public road in front of Sevage's house. He was aroused about two A. M. that night by the roaring of an automobile engine and, looking out, saw a Ford touring car mired in the mudhole. He saw the car, running without lights, drive into Mrs. Groves's premises and in a few minutes heard chickens squawking. He telephoned his neighbor, Oscar Johnson, who lived a half mile south of him, and asked him to call the sheriff. Sevage took his shotgun and went to meet Johnson. They heard this car roaring and found it stuck again in the mudhole. The defendant, Robert Thomas, and Lemur Portwood

were in the car. Sevage presented his gun and ordered them out of the car. Johnson had brought his revolver, and together they over-powered and arrested Thomas and Portwood after they had threatened to kill their captors. After about fifteen minutes Thomas and Portwood begged Sevage and Johnson to let them go. Thomas said it was the first time he had ever stolen any chickens, and whined that it would be a disgrace to his family. He said he would take the chickens back to Mrs. Groves if they would let him go and say nothing about it. He said: "You may send me to the penitentiary, but I'll get you some time." In a little while six other neighbors arrived on the scene. Portwood made his escape.

On the rear seat of the car was a chicken coop with fourteen live and three dead hens in it, Rhode Island Reds and Buff Leghorns. Mrs. Groves was the only one in the neighborhood who kept those breeds of chickens. After she returned to her house in the morning, Sevage, Johnson and the others showed her the chickens in the car. They traced the tracks made by Thomas's car from the mudhole into Mrs. Groves's premises, by the chicken yard north of her house, back to the mudhole. There were no other car tracks. They found the same kind of chicken feathers where the car had stopped in the back yard as they found in the car. The door to the chicken house was open, and the chickens seemed to be frightened. There were foot-prints through the back yard to the hen house. The chicken coop remained in the car until Mr. Clark, the sheriff, arrived. The car was then driven to Mrs. Groves's house, where Clark turned the chickens loose on her front lawn. They ran at once around the house to the chicken yard, a distance of about sixty yards, and mixed with the other chickens.

Thomas told officer Edgar Nall that he got the chickens from his aunt, Mrs. Groves. On cross-examination of the witness Sevage, it was developed that his chickens and meat had been stolen.

Mrs. Groves testified: I live a mile east of Linden, in Clay County, Missouri. On April 23, 1926, I had some Rhode Island Reds, some Buff Leghorns, some Brown Leghorns and a few Plymouth Rock chickens on my place. The defendant, Robert Thomas, is my nephew. I never gave my consent for him or Lemur Portwood to take any of my chickens. Neither of them ever had any interest in any chickens on my place. The chickens that were turned loose on my place by the sheriff on the morning of April 23, 1926, are still there.

On cross-examination: I do not know that they were my chickens. I did not miss any chickens. I did not see these chickens when they were turned loose; I was in my back pantry. I have seen the chickens that were brought there. I don't know whether they were my chickens, and could not say they were mine when they were throwed into my yard.

Redirect: I saw these chickens in the coop as I passed down the road. I never paid much attention, only I seen they were chickens the color of the chickens on my place. I haven't sold a chicken, and as far as I know they are still there. I never did count them to see if I had lost any of them.

When the sheriff arrested the defendant and Portwood, he found them armed. He said to Thomas: "You have taken a muddy time for it." Thomas said: "I did this time."

At the close of the State's case the court overruled a demurrer to the evidence. Mrs. Groves was then recalled by the defendant and being asked if she claimed the chickens returned to her house, answered: I did not know they was my chickens and if they had been and if he had got them it would have been perfectly all right.

The court sustained an objection to the latter part of the answer as not responsive to the question and directed the jury to disregard it. "Q. Did you file this complaint? A. I did not." The court sustained an objection to the question and answer, saying: "I don't think a person can stop the process of the law by failing to make complaint. It is the State that is interested and not the individual." By Mr. Handy: "If the owner of the property, who's ready to testify and has testified here that she made no objection to his taking the property———" By the Court: "Are you proving by this witness that she was the owner of these chickens? Mr. Handy: "No sir. She still says she doesn't claim the ownership of the property." By the Court: "She didn't say that."

"Q. What did you say about the ownership? A. I said I did not claim those chickens. I don't know whether they were my chickens. Q. If they had been, it would have been all right?

"By the Court: That is improper."

Exceptions were saved to these rulings.

Here appellant's counsel offered to prove by Mrs. Groves that if these chickens were hers at the time of the alleged theft and if they were taken by the defendant as alleged in the information, she had no objection to it, and offered further to prove that at the time of alleged theft and the return of the chickens to her place she did not claim the ownership thereof. This offer of proof was excluded and the defendant saved an exception.

I. Appellant contends there was insufficient evidence to sustain a conviction; that the State failed to prove larceny, for the reason that the property alleged to have been taken was not taken against the will of the alleged owner.

There was ample evidence that the defendant and his copartner in crime stole seventeen of Mrs. Groves's chickens in the night time

from her messuage or premises, being the premises on which her dwelling house was situated. The circumstances considered, there can be no reasonable doubt they were her chickens; that Thomas and Portwood drove into her premises and stole the chickens as stated, in the absence and without the knowledge or consent of Mrs. Groves. Much as Mrs. Groves apparently wished to defeat the prosecution and save her nephew from the disgrace of conviction for the crime, she testified she never gave her consent for Thomas or Portwood to take any of her chickens. After Thomas and Portwood had been arrested by Sevage and Johnson they begged to be released. Thomas said it was the first time he had ever stolen chickens; that he would take the chickens back to Mrs. Groves if they would let him go and say nothing. In the same connection he further said to Sevage and Johnson: "You may send me to the penitentiary, but I'll get you some time."

"Larceny is defined as 'a felonious taking and carrying away of the personal goods or chattels of another with intent to deprive the owner of his property therein and to appropriate the same to the use of the taker. Asportation, nonconsent of the owner, and a felonious intent to thereby convert the stolen property to the defendant's own use are necessary elements of larceny.' " [Ladeaux v. State, 74 Neb. 19, 103 N. W. 1048; 36 C. J. 759.]

In State v. Boggs, 181 Iowa, 358, 164 N. W. 759, the defendant was charged with stealing an automobile. The court said:

"The word 'consent' as used in this connection, we think, should be interpreted as meaning voluntarily yielding the will to the proposition of another; acquiescence or compliance therewith. The owner's consent must precede the act of taking, or assuming possession of, the motor vehicle, and does not relate to what transpires thereafter."

The theory of the appellant seems to be that although the chickens were stolen in the night time without the consent of Mrs. Groves, she could, by the fiction of a subsequent consent, nunc pro tunc, purge the larceny of the element of nonconsent. A crime is an offense against the State "directly or indirectly affecting the public, to which the State has annexed certain punishments and penalties, and which it prosecutes in its own name in what is called a criminal proceeding." [16 C. J. 50, 51.] The individual who has suffered the injury, or as in this case, Mrs. Groves, whose property has been stolen, is not a party to the action and it is elemental that she cannot condone the offense. No sophistry can supply the element of consent lacking at the time of the asportation. The court properly excluded the offer of proof by Mrs. Groves that if the defendant took her chickens it was all right.

II. In appellant's brief it is assigned as error that the statement of witness Johnson was prejudicial error; that Instruction 3 did not properly define larceny, and that Instruction 7 is clearly erroneous. These complaints are too general to receive consideration.

III. Complaint is made in the motion for new trial that the court erred in refusing to discharge the jury on motion of the defendant when a witness for the State, Oscar Johnson, testified that Lemur Portwood "had pleaded guilty and was sent to the penitentiary."

The witness testified that Portwood made his escape. He was then asked: "Did you get him?" The answer of the witness was: "And he kept on going, but he was later captured and was sent to the penitentiary." The court sustained an objection to this voluntary statement of the witness, but declined to discharge the jury. It is said in appellant's brief that the statement of the witness was prejudicial error, but no complaint is made of error in the refusal of the court to discharge the jury. The court properly refused to discharge the jury. The statement of the witness was not called for by the prosecution. The defendant had admitted the larceny and offered to return the stolen chickens if Sevage and Johnson would say nothing more about it. This, together with all the facts and circumstances, was in evidence. It is inconceivable that the statement of the witness could have had any prejudicial effect. No complaint is made of the instructions in the motion for new trial.

Finding no error in the record, the judgment is affirmed. *Davis* and *Henwood, CC.*, concur.

PER CURIAM:—The foregoing opinion of HIGBEE, C., is adopted as the decision of the court. All of the judges concur, *Blair, J.*, in Paragraphs I and III and in the result.